# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 22, 2016 Session

## STATE OF TENNESSEE v. THOMAS SANTELLI

### Appeal from the Criminal Court for Knox County
### No. 102700      Bobby R. McGee, Judge

_____

### No. E2015-01004-CCA-R3-CD – Filed June 22, 2016

_____

Defendant, Thomas Santelli, was convicted of one count of driving under the influence (DUI), one count of DUI second offense, and one count of violating the implied consent law. Defendant received a sentence of eleven months and twenty-nine days suspended to probation with all but 100 days to be served in periodic confinement pursuant to court order. Defendant raises the following arguments on appeal: (1) the trial court erred in excluding evidence of a prior traffic stop; (2) the trial court erred in allowing lay opinion testimony of Defendant's impairment; (3) the prosecutor committed prosecutorial misconduct during closing argument; (4) the evidence was insufficient to sustain his conviction; and (5) there was a constructive amendment to the indictment and a fatal variance between the indictment and the evidence presented at trial. Upon our review of the record, we affirm the judgments of the trial court but remand for reconsideration of the manner of service of Defendant's sentence.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed and Remanded in Part

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Mark E. Stephens, District Public Defender; Jonathan Harwell and Christy Murray, Assistant Public Defenders (on appeal); and Lauren A. Carroll (at trial), Morristown, Tennessee, for the appellant, Thomas Santelli.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilbur, Senior Counsel; Charme Allen, District Attorney General; and Sarah Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

This is Defendant's direct appeal from his conviction for DUI second offense. At the May 2014 jury trial, Officer Adam Minner of the Knoxville Police Department testified as to his training and experience in DUI detection and investigation. On December 15, 2012, Officer Minner was on duty conducting DUI and traffic enforcement. Around 2:00 a.m., Officer Minner was driving eastbound on Kingston Pike when he noticed Defendant's vehicle. Officer Minner testified that Defendant's "swerving behavior caught [his] eye," so he began to follow Defendant's vehicle. Officer Minner observed Defendant continue to swerve and almost strike a median. Officer Minner decided to conduct a traffic stop and activated his blue lights, but Defendant did not initially respond. Officer Minner twice "twerked my siren to give an audible notification," but Defendant still did not stop. Defendant finally stopped at a red light in the left turn lane.

Officer Minner admitted that he was frustrated with Defendant and that he "had a tone with him from the get-go" because he did not immediately pull over when Officer Minner activated his blue lights. This made Officer Minner nervous because a driver who refuses to stop could be reaching for a gun or hiding objects in the car. Officer Minner was also "pretty frustrated" that Defendant stopped in a traffic lane after passing several parking lots and other safe places where he could have pulled over to the right side of the road.

Officer Minner approached Defendant's vehicle and immediately smelled an odor of alcohol. Officer Minner asked Defendant why he did not stop, and Defendant responded that he was looking for a "correct" place to stop. Officer Minner testified that he noticed that Defendant had bloodshot eyes and that, during their conversation, Defendant slurred his speech and had "kind of a thick tongue." Officer Minner asked Defendant where he was coming from, and Defendant told him that he was coming from his job at a restaurant called Mulligan's. Defendant stated that he was a singer in a band and that Officer Minner would recognize him from that. Defendant also stated that he had been pulled over before and felt that he was being singled out. Officer Minner testified that he did not recognize Defendant and was not aware of any of these previous traffic stops. Defendant denied drinking and told Officer Minner that he suffered from diabetes and vertigo and that he took medication for those conditions. Officer Minner asked Defendant for his driver's license, and Defendant was slow in retrieving it. Defendant also handed Officer Minner cards showing that he financially supported the Police Benevolence Association (PBA) and the sheriff's office, but Officer Minner told Defendant that he did not want those items.

Officer Minner decided to conduct the field sobriety tests on the sidewalk, which was level ground and out of the lane of traffic. Officer Minner turned his dashboard camera to be able to capture the field sobriety tests. During the horizontal gaze nystagmus (HGN) test, Defendant did not follow Officer Minner's instructions. Officer Minner had to repeatedly tell Defendant to "look at my finger." Defendant said that he was following the officer's instructions, but Officer Minner testified that Defendant kept looking at "the scenery around" them rather than at his finger. Officer Minner terminated the HGN test because of Defendant's refusal to comply. Then, during the walk and turn test, Defendant again refused to listen to the instructions. Defendant kept interrupting Officer Minner to tell him about his vertigo and other conditions. Officer Minner raised his voice and told Defendant to stop interrupting him. At that point, Defendant "decided to use some language" and told Officer Minner to "get out of his F-ing face, you M-effer." Officer Minner described that Defendant "kind of bucked up to fight a little bit." Officer Minner terminated the field sobriety tests and attempted to place Defendant in custody. Defendant did not comply until Officer Minner threatened him with a taser.

Officer Minner testified that after he placed Defendant in his patrol vehicle, Defendant's mood was "[u]p and down." Officer Minner described Defendant as being "very frustrated with me and then another time, you know, I'm his bro and I'm a good man, and then he's frustrated at me again and then I'm not invited to his party anymore." Defendant asked the officer for favors and to tell the tow truck driver certain things about his vehicle. Officer Minner read the implied consent form and asked Defendant to submit to a blood test. Defendant refused, stating that he was a hemophiliac.

The State played a video recording of the traffic stop for the jury. Officer Minner explained that until the dashboard camera is manually turned on or the vehicle's blue lights are activated—which automatically turns on the camera—the camera only captures one picture every second, which results in footage that looks "very jerky." Officer Minner pointed out Defendant's vehicle on the video and testified that he noticed Defendant's vehicle "weaving in and out of a lane," but explained that it was "tough to tell on the video with it being so jerky." Officer Minner pointed out the area where Defendant almost struck the curb of the median. Officer Minner also pointed out where the video shows that Defendant's vehicle was "hugging the white solid line, crossed over it." Officer Minner estimated that he observed Defendant cross the solid white line at least three times.

When Officer Minner activated his blue lights, the camera began recording regular video footage. The video shows that Defendant failed to stop when Officer Minner activated his blue lights and siren. Defendant told Officer Minner that he did not initially stop because he was looking for the "right spot," but he could not explain how the left turn lane was the right spot. Defendant told Officer Minner that he was coming from his job at Mulligan's and denied having anything to drink. Defendant complained that he felt

like he was being harassed because he had been pulled over twice previously. Defendant claimed that Officer Minner might know him because he was the lead singer of the band America. Defendant handed Officer Minner his driver's license but instead of his insurance card, Defendant handed Officer Minner cards showing that he "supports you guys" by contributing to the Sheriff's Office.

Before administering the field sobriety tests, Officer Minner turned the camera toward the sidewalk. When he approached Defendant's vehicle, Defendant again tried to hand Officer Minner a card from the PBA. Defendant again denied drinking and stated that he was a diabetic. Officer Minner walked Defendant over to the sidewalk and asked if he would be willing to perform field sobriety tests, to which Defendant agreed. Defendant explained that he was a diabetic and had vertigo, for which he took Dramamine four times a day. During the HGN test, Officer Minner had to repeatedly tell Defendant to look at his finger. When Officer Minner began the instructions for the walk and turn test, Defendant told him that he did not know if he could do that test because of his vertigo but that he would be willing to submit to a blood test. When Officer Minner raised his voice and told Defendant to "quit interrupting me," Defendant responded, "You've been f---ing with me all night, f---er." Officer Minner told Defendant to turn around, and Defendant responded, "No, get the f--- out of my face." Defendant finally complied when Officer Minner placed his taser against Defendant's chest.

After Officer Minner placed Defendant in the back of the patrol vehicle, Defendant can be heard calmly calling Officer Minner an "a--hole" several times. Defendant then told Officer Minner, "Don't you ever treat me like that again in your life." Defendant complained multiple times throughout the video that he had been pulled over several times in the previous few days or weeks. Then, Defendant called Officer Minner "buddy," and asked him to loosen his handcuffs, to tell the tow truck driver that his car had to be started with a screwdriver, and to retrieve his vertigo medicine from the car, without which "I can get really sick and possibly die." Officer Minner read the implied consent form aloud and asked Defendant if he wanted to give blood. Defendant stated that he was refusing the blood test because he was "a hemophiliac so if you draw my blood, I might not stop bleeding and I could bleed to death." Defendant again asked Officer Minner to tell the tow truck driver about his car; when Officer Minner said "no," Defendant called him an "a--hole" multiple times. Defendant then called Officer Minner a "peanut head" and "insignificant." Defendant then said "If you stun gun me, you better kill me." Defendant denied that he ran a red light and stated that Officer Minner did not have the right to pull him over for swerving "under the statutes of 464 and 585." Defendant then stated, "Don't ever say you want to come to my Christmas party again. I'm not inviting you anymore."

When Officer Minner resumed testifying, he gave his opinion that Defendant was unsafe to drive. Officer Minner explained that he came to that conclusion due to the odor

of alcohol, Defendant's bloodshot eyes and slurred speech, and Defendant's "irrational state, his emotional up and downs." Officer Minner testified that if a vehicle had not been involved, he would have arrested Defendant for public intoxication.

On cross-examination, Officer Minner denied that he was specifically looking to arrest someone for DUI but explained that he was conducting traffic enforcement "with the goal of reducing DUI related accidents and fatalities." Officer Minner admitted that he did not switch his dashboard camera from "picture mode" to "live mode" when he observed Defendant's swerving. Officer Minner testified that the Knoxville Police Department stopped offering breath tests about five years ago and that the Tennessee Bureau of Investigation (TBI) no longer comes out to certify their machines. On redirect, Officer Minner explained that breath tests would not reveal the presence of drugs in a person's system. He also testified that he had no doubt in his mind when he arrested Defendant that Defendant was impaired.

Defendant testified that he was a professional musician that had performed with America, Bruce Springsteen, and the Allman Brothers. Defendant stated that he also performed for charity and that he was a youth drug and alcohol counselor. Defendant testified that he had vertigo which affects his balance and speech and makes him nauseated. Defendant testified that he took medication for that condition along with medication for diabetes, cholesterol, and high blood pressure. Defendant admitted into evidence his medical records from his visit to the hospital in 2012 when he was first diagnosed with vertigo. Defendant testified that he was also a hemophiliac and that he took his medications in pill form because he cannot use a needle.

Defendant testified that on December 15, 2012, he played his usual show at Mulligan's, an Italian restaurant. Defendant testified that he had not eaten since noon and that the only thing he had to drink was unsweet tea. Defendant was on his way to Taco Bell to get something to eat when he was pulled over. Defendant testified that it was the third time in the past two weeks that he had been pulled over in that same spot at that same time of night. Defendant denied that he had been drinking and denied that he used drugs because his medications make him "feel bad enough as it is." Defendant explained that he was not supposed to drink alcohol with the medications he took.

Defendant testified that he "was driving just fine." Defendant claimed that Officer Minner yelled at him to pull over before the stop but that Officer Minner "cut that out of the tape." Defendant denied that he was swerving or that he almost struck a barrier. Defendant testified that he did not pull over to the right side of the road because there was a truck next to him in the right lane. Defendant testified that he was scared of Officer Minner and that "the only defense I had was my mouth." Defendant explained that Officer Minner's demeanor reminded him of his father, who used to yell at him and beat him. Defendant thought he was following the officer's instructions during the HGN

test but explained that diabetes can affect a person's eyes. Defendant believed that "[t]here was nothing I could have done to please him." Defendant tried to tell Officer Minner about his medical conditions, but Officer Minner would not listen to him. Defendant testified that he was willing to submit to a breath test but that Officer Minner did not offer it to him. Defendant testified that he refused the blood test because of his hemophilia. Defendant explained that if he ever gets a cut, he has to go to the hospital to "have a tourniquet put on to stop [him] from bleeding." Defendant explained that he mentioned the Christmas party in an attempt to be funny.

On cross-examination, Defendant admitted that he cursed Officer Minner, explaining that Officer Minner "was being a prick to me all night, yelling at me top of his lungs." With regard to the PBA card, Defendant testified that it was a "courtesy card . . . like don't bother me card." Defendant explained that the cards showed that he supported the police and that they could be used to "get[] you out of a speeding ticket or . . . a parking ticket." Defendant testified that he did not know if the card would get him out of a DUI charge because the officer did not take it. The prosecutor asked Defendant if he had a tattoo, and Defendant initially said "no." Defendant then admitted that he had one tattoo on his left shoulder. Defendant stated that he found out he was a hemophiliac when he got the tattoo because it would not stop bleeding until a tourniquet was placed on his arm. The prosecutor had Defendant read from his box of motion sickness medication, which warned that the medication can cause drowsiness and advised against driving a motor vehicle and using the medication with alcohol. Defendant denied that he was "mixing" alcohol and his medication. On redirect examination, Defendant explained that the odor of alcohol that Officer Minner smelled could have been the hand sanitizer that he keeps in the car to use after shaking hands of the people who see his show.

The jury convicted Defendant of DUI, and the trial court found Defendant in violation of the implied consent law. Defendant pled guilty to second offense DUI, and the jury affixed a fine of $1500. The trial court merged the two counts of DUI into a single conviction for second offense DUI and sentenced Defendant to eleven months and twenty-nine days with all but 100 days suspended to supervised probation. Defendant's driving privileges were revoked for a period of two years.

On July 16, 2014, Defendant filed a pro se motion for new trial which included an allegation of ineffective assistance of counsel.[1] Trial counsel also filed a motion for new trial on July 17, 2014, as well as a motion to withdraw. Subsequently, the trial court found Defendant to be indigent and appointed the Public Defender to represent him on appeal. Appellate counsel filed an amended motion for new trial on March 18, 2015.

---

[1] The ineffective assistance of counsel claim was withdrawn at the hearing on Defendant's motion for new trial.

After a hearing on the motion and taking the matter under advisement, the trial court denied the motion for new trial. Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the trial court erred in excluding evidence of a prior traffic stop, that the trial court erred in allowing lay opinion testimony of Defendant's impairment, that the prosecutor committed prosecutorial misconduct during closing argument, that the evidence was insufficient to sustain his conviction, and that there was a constructive amendment to the indictment and a fatal variance between the indictment and the evidence presented at trial.

*I. Excluded Evidence and Right to Present a Defense*

Defendant argues that the trial court erred in precluding the defense from presenting evidence regarding Defendant's prior encounter with a police officer in an attempt to explain his refusal to take the blood test. Defendant contends that the exclusion of this evidence violated his constitutional right to present a defense. The State responds that evidence of what occurred on a prior occasion was irrelevant and would run counter to Defendant's argument that he refused the blood test due to his hemophilia.

During opening statement, trial counsel noted that Defendant refused to submit to a blood test due to his hemophilia. She continued:

> [Defendant], on a prior occasion, is going to testify to when he was pulled over he was actually taken to the hospital by an officer to have his blood drawn but the officer just left him in the car and they never went in and had the blood test done, so . . .

The prosecutor immediately objected that "something that's going on in another case" was irrelevant. The trial court sustained the objection and gave a curative instruction to the jury to disregard anything about what may have happened on a prior occasion.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence must be relevant to be admissible. Tenn. R. Evid. 402. Even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading of the jury. . . ." Tenn. R. Evid. 403. On appeal, this Court will review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In this case, the trial court did not abuse its discretion when it ruled that Defendant's prior encounter with a police officer was irrelevant. Whether Defendant agreed to a blood test that was never conducted during a different traffic stop would not make it more or less probable that he was driving under the influence on the night of December 15, 2012. Even if somewhat relevant to explain Defendant's refusal to the blood test on this occasion, thereby negating the inference that his refusal was a sign of guilt, the evidence would still be excluded under Rule 403. The probative value of this evidence is substantially outweighed by the danger of confusing the issues and misleading the jury. Additionally, evidence that Defendant previously agreed to a blood test does not support the defense theory that Defendant *could not* agree to the blood test in this case because of his hemophilia.

Defendant further contends that the trial court's exclusion of this evidence violated his constitutional right to present a defense. *See State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (noting that a criminal defendant's right to present a defense is protected by both the Sixth and Fourteenth Amendments). "[A]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation." *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006) (citing *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003)). In order to determine whether a trial court's ruling regarding the exclusion of evidence violated a defendant's right to present a defense, this Court must consider whether:

> (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d. at 433-34 (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301 (1973)).

None of the *Brown* factors listed above support admission of the evidence in question. The evidence was not critical to the defense because, as explained above, the defense theory was to rely on Defendant's various medical conditions to explain his behavior. Defendant testified that he had hemophilia and was concerned that he could bleed to death without serious medical intervention. Evidence that Defendant had agreed to a blood test on a prior occasion was not critical to his overall defense theory. Secondly, the evidence did not bear sufficient indicia of reliability. Defense counsel, in opening statement, spoke to Defendant's characterization of this prior encounter: that he agreed to the blood draw, was taken to the hospital, but the blood draw was never conducted; however, Defendant did not make a proffer of the alleged evidence either during trial or the motion for new trial hearing. The State, during the motion for new trial hearing, argued that the arresting officer would have been called in rebuttal to testify that the reason Defendant's blood was not drawn on that prior occasion was due to

Defendant's belligerence and threats toward the officer, which was bolstered by a video of that prior stop.[2] Finally, the interests supporting exclusion of the evidence—relevance, potential confusion for the jury, as well as potential prejudice to Defendant—are substantially important and outweigh any slight probative value the evidence may have had. Therefore, the trial court's ruling excluding this evidence did not violate Defendant's right to present a defense.

## *II. Lay Opinion Testimony*

Defendant argues that the trial court erred when it allowed Officer Minner to testify to his opinion that Defendant was impaired and unsafe to drive. Defendant concedes that he did not object to this testimony at trial; therefore, the argument is waived unless Defendant can establish that the trial court committed plain error. *See* Tenn. R. App. P. 36(a), (b). There are five factors that must be established before an error may be recognized as plain:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The burden is on the accused to persuade the appellate court that the trial court committed plain error and that the error was of "such a great magnitude that it probably changed the outcome of the trial." *Id.* at 283 (quoting *Adkisson*, 899 S.W.2d at 642); *see also* Tenn. R. App. P. 36(b) (relief may be granted when an "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process"). "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*.

In this case, Defendant cannot establish that a clear and unequivocal rule of law has been breached. Under Tennessee Rule of Evidence 701, a lay witness may testify to opinions or inferences that are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Opinion testimony which embraces an ultimate issue to be decided by the trier of fact, if otherwise properly admitted, is not objectionable. *See* Tenn. R. Evid. 704. "[A] lay witness may testify to his own physical condition or that of another person

---

[2] We note that if the State had attempted to introduce this evidence during its case-in-chief, it almost certainly would have been excluded under Tennessee Rule of Evidence 404(b).

provided that the witness first states the detailed facts and then gives his opinion or conclusion." *Simpson v. Satterfield*, 564 S.W.2d 953, 955-56 (Tenn. 1978). Further, "this Court has determined that a police officer's 'opinion of intoxication as a lay witness was clearly admissible based upon his perception of the [defendant] at the time of arrest.'" *State v. Ernest Michael Turner*, No. W2006-02661-CCA-R3-CD, 2008 WL 1700338, at *7 (Tenn. Crim. App. Apr. 4, 2008) (quoting *State v. Johnnie Darrell Rice*, No. M2003-01294-CCA-R3-CD, 2004 WL 1857108, at *3 (Tenn. Crim. App. Aug. 17, 2004)); *see also, e.g.*, *State v. Dobbins*, 265 S.W.3d 419, 420-21 (Tenn. Crim. App. 2007) (affirming DUI conviction where officer testified that "he formed an opinion that the defendant was too impaired to operate a motor vehicle"); *State v. Lawrence*, 995 S.W.2d 142, 144 (Tenn. Crim. App. 1998) (affirming DUI conviction where officer testified that defendant "had been driving in an impaired state due to alcohol consumption").

Officer Minner testified as to his experience investigating DUI cases and noted the numerous signs of intoxication displayed by Defendant. His opinion that Defendant was unsafe to drive was rationally based on his observations and was helpful to a determination of a fact in issue—namely, whether Defendant was driving under the influence of an intoxicant that impaired his ability to safely operate a motor vehicle. *See* T.C.A. § 55-10-401(1). Defendant is not entitled to plain error relief.

### III. *Prosecutorial Misconduct in Closing Argument*

Defendant contends that during closing argument, the prosecutor misstated the evidence with regard to Defendant's vertigo medication and argued facts outside of the record with regard to Defendant's hemophilia. However, Defendant failed to make a contemporaneous objection to these statements at trial. Therefore, the issue is waived unless Defendant can establish that the prosecutor's arguments constituted plain error. Tenn. R. App. P. 36(a); *see State v. Fusco*, 404 S.W.3d 504, 519 (Tenn. Crim. App. 2012). As stated above, the burden is on the defendant to establish all five *Adkisson* factors in order to persuade this Court that the trial court committed plain error. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Closing arguments "have special importance in the adversarial process," allowing the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). Attorneys "should be given great latitude in both the style and the substance of their arguments." *Id.* at 131. However, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* Although not exhaustive, this Court has recognized five general areas of potential

prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.*

Defendant contends that the prosecutor misstated the evidence when she argued that the vertigo medication warned against operating a motor vehicle. Specifically, the prosecutor said:

> And you have the boxes of that off-brand Dramamine, that anti-motion sickness drug that says this is going to cause drowsiness, this is going to cause you to use caution, you don't need to operate a motor vehicle or heavy machinery. And why is that? Because it's impairing. It causes these effects like alcohol does and alcohol can enhance those effects as well.

This argument was in direct reference to the box of medication brought by Defendant and Defendant's admission that he had taken that medication. The box itself was admitted into evidence and read aloud by Defendant, and the jury could have reviewed the warning label to ensure that the prosecutor's interpretation matched their own. Defendant has not shown that the prosecutor intentionally misstated the evidence or attempted to mislead the jury and has not shown that the argument was so inflammatory that if affected the outcome of the trial.

Defendant next argues that the prosecutor committed misconduct when relating medical information to the jury regarding Defendant's hemophilia. Specifically, Defendant takes issue with the prosecutor's statements that Defendant would have discovered he had hemophilia long before he got his tattoo, that playing guitar would cause a hemophiliac's hands to bleed, that people with diabetes must prick their fingers which would be dangerous for a hemophiliac, and that a hemophiliac would be on some type of anticoagulant to prevent bleeding. Defendant contends that these statements were not entered into evidence by a qualified witness and that the prosecutor "served, in essence, as her own expert witness." However, it seems well within the realm of common knowledge that hemophilia is a serious medical condition that could potentially cause someone to bleed to death. The prosecutor in this case was questioning Defendant's credibility by pointing to not only hypotheticals about childhood scrapes, but

also to the medical records entered into evidence by Defendant that did not indicate any concern about his blood or potential for bleeding. Defendant has not shown that the prosecutor's statements breached a clear and unequivocal rule of law. Defendant is not entitled to relief.

## IV. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *Wagner*, 382 S.W.3d at 297 (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

It is unlawful for any person to drive a motor vehicle on any public roads of the state while under the influence of any intoxicant, drug, substance affecting the central nervous system, or a combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess. T.C.A. § 55-10-401(1).

In this case, the State presented the testimony of Officer Minner in addition to the video of the traffic stop. Officer Minner testified that he noticed Defendant's vehicle swerving and almost striking the curb of a median. Defendant was slow to stop once Officer Minner activated both his lights and siren. When Officer Minner approached Defendant, he noticed that Defendant had an odor of alcohol about his person, bloodshot eyes, and slurred speech. Officer Minner attempted to conduct field

sobriety tests, but Defendant would not follow instructions and continuously interrupted Officer Minner. Officer Minner terminated the field sobriety tests when Defendant became aggressive. Defendant then refused to submit to a blood test, from which the jury may infer a consciousness of guilt. Based on both the video and Officer Minner's testimony, any rational trier of fact could have found beyond a reasonable doubt that Defendant was driving under the influence. Defendant is not entitled to relief.

### V. Variance and Constructive Amendment of the Indictment

Defendant argues that the indictment was constructively amended when the jury was allowed to convict based on a theory that Defendant was under the influence of medication where the original indictment charged Defendant with being under the influence of an intoxicant. The State responds that the prosecutor's statement during closing argument that Defendant may have been under the influence of medication was not proof and, therefore, there was no constructive amendment of the indictment.

An accused has a constitutional right to be informed of the nature and cause of the accusation against him or her. U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9. An indictment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. T.C.A. § 40-13-202; *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). "[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." *State v. Cleveland*, 959 S.W.2d 548, 552 (Tenn. 1997) (citing *State v. Trusty*, 919 S.W.2d 305, 310 (Tenn. 1996)).

As this Court observed in *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001):

> [C]ourts [must] distinguish between constructive amendments of the indictment, which are reversible *per se*, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, the trial court's refusal to restrict the jury charge to the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant.

- 13 -

*Id.* (quoting *United States v. Adams*, 778 F.2d 1117, 1123 (5th Cir.1985)). A variance between an indictment and the evidence presented at trial "is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997)). A variance is not material when the indictment and the proof substantially correspond, the defendant is not misled or surprised at trial, and there is protection against a second prosecution of the same offense. *Moss*, 662 S.W.2d at 592.

In this case, there was no constructive amendment of the indictment and no fatal variance between the indictment and the proof adduced at trial. The trial court instructed the jury with regard to the essential elements of driving under the influence as follows:

> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant was driving or was in physical control of an automobile or motor driven vehicle;
>
> and (2) that this act occurred on a public road or highway or public street or alley;
>
> and (3) that the defendant was under the influence of an intoxicant.
>
> The expression "under the influence of an intoxicant" covers not only all well-known and easily recognized conditions and degrees of intoxication, but also any mental or physical condition which is the result of taking an intoxicant in any form and which deprives one of that clearness of mind and control of one's self which one would otherwise possess. In this situation, it would not be necessary that the person be in such a condition as would make him or her guilty of public drunkenness. The law merely requires that the person be under the influence of an intoxicant. The degree of intoxication must be such that it impairs to any extent the driver's ability to operate a vehicle.

Even if we were to accept Defendant's argument that the term "intoxicant" does not include drugs and medications—which has been soundly rejected by this Court, *see State v. Carolyn Nadine Killian*, No. M2011-02591-CCA-R3-CD, 2012 WL 6171063, at *9 (Tenn. Crim. App. Dec. 11, 2012) (holding that the term "intoxicant" includes both alcohol and drugs), *no perm. app. filed*—the trial court instructed the jury only with regard to being under the influence of an intoxicant, the word used in the indictment. The

State's theory at trial was that Defendant was driving under the influence of alcohol, which is an intoxicant. *See State v. Clark*, 355 S.W.3d 590, 594 (Tenn. Crim. App. 2011). Any argument by the prosecutor that Defendant may have also been under the influence of an over-the-counter anti-motion sickness medication was in direct response to Defendant's testimony and was not evidence. *See Cleveland*, 959 S.W.2d at 555 ("[S]tatements of counsel during closing argument are not evidence."). Furthermore, Defendant cannot claim that he was misled or surprised by the prosecutor's arguments when he introduced the evidence in the first place. *See Moss*, 662 S.W.2d at 592. Defendant is not entitled to relief.

## VI. *Sentencing*

Though not raised by either party, Defendant's sentence for second offense DUI is illegal because it directly contravenes an applicable statute. The record before this Court includes an order from the trial court allowing Defendant to serve the 100-day portion of his sentence in periodic confinement due to his employment. Pursuant to statute, Defendant is required to serve the mandatory minimum sentence of 45 days continuously and is not eligible for probation until he has served at least that time. T.C.A. § 55-10-402(a)(2)(A), -411(c). Furthermore, according to Defendant's affidavit of indigency for the appointment of appellant counsel, he is no longer employed.[3] Therefore, we remand the case to the trial court for reconsideration of the manner of service of Defendant's sentence.

## *Conclusion*

Based on the foregoing, we affirm the judgments of the trial court with regard to Defendant's convictions. We reverse the trial court's judgment with regard to the manner of service of Defendant's sentence and remand the case for reconsideration.

_____
TIMOTHY L. EASTER, JUDGE

---

[3] The trial court entered an Order for Periodic Confinement on July 11, 2014. The Defendant's sworn Uniformed Affidavit of Indigency was signed by Defendant on October 30, 2014.